UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/17/2026

KATAWBA DE LA ROSA,

        Plaintiff,

-against-

THE CITY OF NEW YORK, NEW YORK CITY FIRE
DEPARTMENT, and RONALD RICCITELLI,
individually,

        Defendants.

1:24cv-9182 (MKV)

ORDER AND OPINION
GRANTING MOTION TO
DISMISS

MARY KAY VYSKOCIL, United States District Judge:

Plaintiff Katawba De La Rosa ("Plaintiff") commenced this action by suing the City of
New York (the "City"), the New York City Fire Department (the "FDNY"), and one Ronald
Riccitelli ("Riccitelli") in this Court. [ECF No. 1] (the "Complaint"). On June 3, 2025, in response
to a request for a pre-motion conference concerning a contemplated motion to dismiss, *see* [ECF
Nos. 20, 21, 22, 23], Plaintiff filed an amended complaint. [ECF No. 25] (the "Amended
Complaint," or "AC"). The Amended Complaint asserts causes of action against only the City
(the "Defendant") for discrimination and retaliation under Title VII of the Civil Rights Act of
1964, 42 U.S.C. §§ 2000 *et seq.* ("Title VII"), the New York City Administrative Code, and New
York state law. AC ¶¶ 118–142. Defendant filed a motion to dismiss under Fed. R. Civ. P.
12(b)(6), [ECF No. 29], supported by a memorandum, [ECF No. 31] (the "MTD"). Plaintiff
opposed, [ECF No. 33] (the "Opp."), and Defendant replied, [ECF No. 34] (the "Reply").

## BACKGROUND

Plaintiff, who is a Black and Hispanic woman, AC ¶ 16, worked for Defendants between
October 15, 2019, AC ¶ 19, and October 21, 2022, AC ¶ 109. She started in the Sprinkler

Standpipe Unit, AC ¶ 20, and was later transferred to the Customer Service Center ("CSC"), AC ¶ 21.

On March 9, 2021, Plaintiff received a fire-safety call from a resident of the Bronx. AC ¶ 22. The caller was a repeat complainant, and the CSC had already determined based upon prior calls that her file should be closed. AC ¶ 23–25. Plaintiff reopened the file and logged the call. AC ¶ 24. This triggered a series of messages and calls from the CSC manager, Pamela St. Francis, who, after closing the file, directed Plaintiff not to reopen closed files, made disparaging remarks about the caller's credibility and socioeconomic status, and instructed Plaintiff to do as she was told (the "Closed-Call Incident"). AC ¶¶ 24–27. Plaintiff related this exchange to one William Coco, Solution Lead ("Coco"), who told her to follow her manager's orders. AC ¶ 28. Plaintiff followed up on this incident with the involved parties, the FDNY's Bureau of Investigations and Trials ("BITS"), and the Department of Investigations ("DOI"). AC ¶¶ 29–32.

About a week after that incident, on March 16, 2021, Plaintiff's access credentials were blocked and she was told that she would be reassigned from CSC to a role in which she would assist Chief Inspector Fitzroy Benjamin ("Benjamin") in training the Bureau of Fire Prevention on Accela Automation (the "Accela Reassignment"). AC ¶¶ 34–37. She was also notified that she was under investigation by BITS and DOI in connection with alleged falsification of documentation (the "False Documents Investigation"). AC ¶ 37. Plaintiff was to have no contact with the public in her role pending the outcome of that investigation. *Id.* The outcome of the investigation is not made clear. AC ¶ 40.

Six months later, on October 27, 2021, Plaintiff sent an email to various FDNY executives and investigators to inform them of certain complaints against three individuals: Dominic Crecenzo ("Crecenzo"), Anika Ryan-Saul ("Ryan-Saul"), and Riccitelli (the "October 2021 email"). The events detailed in that email dated back over a year, starting with an incident in July

2

2020, when Crecenzo told Plaintiff that her COVID mask reminded him of his wife's underwear (the "Mask Remark"). AC ¶ 41. Plaintiff expressly declined to proceed via a complaint to the Equal Employment Opportunity Office (the "EEOO") with regard to the Mask Remark. AC ¶ 41–42. The October 2021 email also discussed an incident on September 17, 2021, when Deputy Chief Inspector Darryl Chalmers ("Chalmers") yelled "I'm in a meeting!" at Plaintiff and slid a door shut in her face (the "'In-A-Meeting Incident'"). AC ¶ 44. Chalmers apologized the same day, *id.*, and again later, AC ¶ 45.

Five days thereafter, on September 22, 2021, Plaintiff was talking with Chalmers when Chalmers' relative, Ryan-Saul, approached them and yelled at Chalmers. AC ¶ 46. After a brief encounter between Plaintiff and Ryan-Saul in the restroom, when neither individual spoke to the other, Ryan-Saul filed a workplace violence case against Plaintiff (the "Workplace Violence Investigation"). AC ¶ 48. Upon learning of the Workplace Violence Investigation against her, Plaintiff complained to her supervisor that her workplace had become hostile, and indicated that she felt compelled to resign (the "Resignation Call"). AC ¶ 49. Plaintiff did not resign, AC ¶ 50, and the Workplace Violence Investigation proceeded, AC ¶ 51. Again, the outcome of that investigation is left unclear, but during its pendency, on September 23, 2021, Plaintiff was reassigned to District Office 6/7, effective as of September 27, 2021 (the "Workplace Violence Reassignment"). AC ¶ 52. Plaintiff complained to BITS and the EEOO of nepotism and hostility. AC ¶ 54.

On September 29, 2021, while the Workplace Violence Investigation remained pending, Plaintiff was again reassigned to District Organization 14 (the "Riccitelli Reassignment").[1] AC ¶ 56. It is not immediately clear whether, when, or in what capacity Plaintiff had previously been

---

[1] It is not clear from Plaintiff's pleadings whether the Riccitelli reassignment occurred on, or rather shortly before, September 29, 2021. *Compare* AC ¶ 52 *with* AC ¶ 56 *and with* AC ¶ 58.

assigned to District Organization 14, but she was back to conducting Accela training, and back under the supervision of Riccitelli.  AC ¶¶ 57–58.

Shortly after the Riccitelli Reassignment, Plaintiff was subjected to a roughly month-long stretch of inappropriate conduct by Riccitelli.  This began in the last few days of September 2021, when Riccitelli asked whether Plaintiff's husband was Black (the "Husband's Race Question"), if she liked Italian men (the "Italian Men Question"), and for her phone number (because, as he informed her, he got "all the pretty girls' cell numbers") (the "Pretty Girls Remark").  AC ¶ 58. On October 14, 2021, Riccitelli directed Plaintiff to take and send to him a photo of a trainee, whom he referred to as a "geriatric patient" ("Geriatric Patient Remark #1").  AC ¶ 59.  Plaintiff complied, and Riccitelli responded with GIFs of Black women snapping their fingers, throwing up their hands, and making thumbs-up gestures (the "Black Women GIFs Incident").  The next day, Riccitelli referred to another trainee as a "geriatric patient" ("Geriatric Patient Remark #2").  AC ¶ 65.  He also invited Plaintiff to celebrate his birthday with him and asked about her plans for the weekend, interposing carrot-and-stick references to his authority to authorize overtime,  AC ¶¶ 66–68, and had made a similar remark on October 1, 2021,  AC ¶ 58 (the "Carrot-And-Stick Invitations").

On October 18, 2021, Riccitelli told Plaintiff to email him upon arrival at the office, and then asked, "What is your problem?" when she complied, before instructing her to call his personal cell phone instead (the "Report-on-Arrival Directive").  AC ¶ 70–71.  He told her that the Report-on-Arrival Directive was standard operating procedure—at least for her—and further elaborated that "if he told [her] to hop on one leg and bark like a dog, [she] better do it" because FDNY "is a paramilitary organization" (the "Paramilitary Organization Remark").  AC ¶ 72.  Plaintiff went to the bathroom to vomit, and began to suffer a migraine.  *Id.*  Another individual was subsequently called in to instruct Plaintiff that the FDNY is indeed a paramilitary organization, but when

Plaintiff asked whether he had himself been subjected to the Report-on-Arrival Directive, he admitted that he had not.  AC ¶ 75.  Plaintiff again indicated that she felt sick and needed to leave. AC ¶ 76.

The same day, Plaintiff requested and was quickly granted Intermittent Family and Medical Act Leave, AC ¶¶ 77–78, but returned to work days later on October 25, 2021, AC ¶ 79.  Upon Plaintiff's return, Riccitelli told her she was fired and instructed another individual to box up Plaintiff's belongings and escort her out of the building (the "Would-Be Termination").  AC ¶ 79– 80.  Plaintiff called the EEOO and BITs, and was told that the Would-Be Termination was effectively meaningless, and, within two hours, she was directed to report to the Chief.  AC ¶¶ 82– 83.  On November 8, 2021, following EEOO directions, she returned to work at FDNY headquarters, again under Benjamin.  AC ¶¶ 86–87.

On December 29, 2021, Plaintiff forwarded the October 2021 email to DOI, styled as a "Cry for help."  AC ¶ 88.  A month later, on January 27, 2022, Plaintiff was moved from her cubicle to a chair in the middle of the work floor ("Seat Reassignment #1").  AC ¶ 89.  She requested to be moved back, and, in March 2022, she was.  AC ¶ 90–91.  But on June 2, 2022, she was moved to a cubicle outside the office of Coco, to whom she had reported the Closed-Call incident nearly a year earlier ("Seat Reassignment #2").  AC ¶ 92.  Four days later, Plaintiff made an anonymous 311/CSC call regarding fire-safety concerns.  AC ¶ 93.  This resulted in another BITS investigation into her conduct (the "Anonymous Call Investigation").  AC ¶ 93–94.  Again, the result of this investigation is not made clear, but Plaintiff was told on June 15, 2022, "we don't report on our colleagues."  AC ¶ 95.  On June 27, 2022, Plaintiff emailed an array of FDNY units and personnel, including the Commissioner and BITS, to report on official misconduct and fire-safety concerns.  AC ¶ 97.

On June 28, 2022, Plaintiff reported a threat from a coworker, Donna Chambers, who told Plaintiff that she had "sealed [her] fate" and that Chambers was "going to get [Chambers'] son to beat [Plaintiff's] ass." AC ¶ 98. Plaintiff filed an Equal Employment Opportunity Complaint ("EEO Complaint") with the EEOO against one Supervising Inspector Barrett, and a workplace violence complaint against Chambers, in connection with this event.[2] AC ¶ 98–99. Plaintiff was denied Union representation in connection with the "official charges from the FDNY" that arose from these complaints. AC ¶ 100. Otherwise, the outcome is unspecified.

On July 1, 2022, Plaintiff learned that she was the subject of yet another investigation, this one concerning reports that she had sexually harassed another employee (the "Sexual Harassment Investigation"). AC ¶ 101. Again, the results of this investigation are not made clear, but, around the same time, Plaintiff sent an email to the Federal Monitor appointed to oversee the FDNY's compliance with court-ordered hiring practices. AC ¶¶ 101–102.

Finally, on June 24, 2022, Plaintiff emailed Jeffrey Assisi, Senior Director, FDNY Talent & Employee Services ("Assisi"), detailing her belief that she had been passed over for interviews and promotions, mostly in Human Resources, for which she was qualified by education and experience (the "No Interview/Not Hired Email"). AC ¶ 104–105. The denials cited included four applications to serve as a Fire Protection Inspector (the "FPI Denials"), the latest of which was submitted on October 9, 2021 (the "October 2021 FPI Denial"). AC ¶ 105. In the No-Interview/Not Hired Email, Plaintiff asserted that these decisions resulted from a comment at an unidentified time made by Chalmers to Human Resources personnel that hiring Plaintiff would "be a bad look for their unit" because she was "trouble" and "[did] not hold credentials[.]" AC ¶

---

[2] Neither of these, which appear to have been filed with "the equal employment office of a city agency[,]" *Adeniji v. Admin. for Child. Servs., NYC*, 43 F. Supp. 2d 407, 421 n.4 (S.D.N.Y.), *aff'd sub nom. Adeniji v. Admin. For Children's Servs.*, 201 F.3d 430 (2d Cir. 1999), constitutes a charge filed with the Equal Employment Opportunity Commission (the "EEOC").

106.  On June 22, 2022, Plaintiff informally applied to move back to District Office 6/7 to help with "Accela Automation administrative needs," but was told by Chief Inspector Shaw ("Shaw") that her help was not needed.  AC ¶¶ 107–108.

Around four months later, on October 21, 2022, Plaintiff left the FDNY.  AC ¶ 108. On November 8, 2022, Plaintiff submitted a charge of discrimination to the EEOC.  AC ¶ 11; [ECF No. 30-1] (the "Charge").[3]  The Charge covers acts of discrimination dating from March 3, 2021 to October 21, 2022.   Charge at 1.  It alleges, in stark contrast to the Amended Complaint, that over the course of her entire tenure at the FDNY, Plaintiff had "no complaints or issues."  *Id.*  The Charge claims discrimination based on "National Origin [and] Sex."  *Id.*  It alleges two discriminatory acts:  1) the Accela Reassignment, which the Charge notes came without a $10,000 bonus paid to males in a similar context, and 2) the denial of a request for "a merit promotion or to be a provisional Fire Protection Inspector II."  *Id.*  This latter claim apparently references the various applications cited in the No-Interview/Not Hired Email, generally, and the FPI Denials in particular.  *Id.*  The Charge does not note Plaintiff's resignation.  *See id.*

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, the Complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  On a motion to dismiss, the court must accept as true "all well-pleaded factual allegations" and draw all reasonable inferences in favor of the non-moving party,

---

[3] "It is . . . well settled that, in deciding a motion to dismiss in an employment discrimination action, a district court may consider the plaintiff's previously filed charge with the EEOC." *Windley/Edwards v. NYC Dep't of Educ.*, 2025 WL 2615504, at *4 (S.D.N.Y. July 15, 2025) (collecting cases), *report and recommendation adopted as modified sub nom. Windley-Edwards v. New York City Dep't of Educ.*, 2025 WL 2463542 (S.D.N.Y. Aug. 27, 2025).

but does "not consider conclusory allegations or legal conclusions couched as factual allegations." *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021) (internal quotations and citations omitted); *see also Iqbal*, 556 U.S. at 664 (while a court "must accept as true all of the allegations contained in a complaint," this "tenet ... is inapplicable to legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice").

In considering a motion to dismiss, the Court "must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999); *see also Offor v. Mercy Med. Ctr.*, 2023 WL 2579040, at *1 (2d Cir. Mar. 21, 2023) (summary order), *cert. denied*, __ U.S. __, 144 S. Ct. 87 (2023) (mem.).

## DISCUSSION

### I. Federal Claims

#### a. Exhaustion and Timeliness

"A district court only has jurisdiction to hear Title VII claims that either are [timely] included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge." *Butts v. City of New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993). "[In New York state], the statute of limitations for filing a charge of discrimination with the EEOC is 300 days." *Id.* Because Plaintiff filed her Charge on November 8, 2022, only conduct that occurred on or after January 12, 2022, was timely included and thus preserved for review by this Court. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002) ("The critical questions, then, are: What constitutes an 'unlawful employment practice' and when has that practice 'occurred'?" (quoting Title 42 U.S.C. § 2000e–

5(e)(1))).

Plaintiff's Charge alleges two discriminatory acts.  First, the Accela Reassignment, Charge at 1, which occurred on or about March 16, 2021, AC ¶¶ 34–37.  Claims arising out of this incident are clearly time-barred.  *See Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir. 1996) ("[O]nly events that occurred during the 300–day period prior to filing . . . are actionable under Title VII.").  Second, Plaintiff's Charge includes an allegation that she "then asked for a merit promotion or to be a provisional Fire Protection Inspector II but was denied."  Charge at 1.  The only FPI Denial that post-dates the Accela Reassignment was the October 2021 FPI Denial. AC ¶ 105.  This, too, is time-barred.  *See Van Zant*, 80 F.3d at 712.

This leaves Plaintiff's request "for a merit promotion," which was made on some unspecified date to some unspecified entity with respect to some unspecified position (the "'Merit Promotion' Denial").  Charge at 1.  Nowhere in either the Amended Complaint or her Opposition does Plaintiff clarify anything about the nature, timing, context, or medium of this particular request.  Instead, the Amended Complaint makes the conclusory allegation that "[a]s a result of the abhorrent discrimination and sexual harassment inflicted upon Plaintiff . . . , and in retaliation for Plaintiff complaining about the unlawful discrimination and sexual harassment and for taking protected leave, Plaintiff was never provided with the opportunity to be promoted, let alone interviewed, for" scores of different internal roles to which she applied between and February 4, 2020, and May 17, 2022.  AC ¶¶ 104–105.

Plaintiff argues that the Court should constructively expand the scope of her Charge to permit her to proceed with the full range of "sex and national origin discrimination[,] hostile work environment, retaliation, and wrongful termination" claims suggested by the Amended Complaint. Opp. at 29.  After all, Plaintiff asserts, "the EEOC had sufficient knowledge of the claims that Plaintiff was pursuing" since she indicated "National Origin [and] Sex" as the bases of

discrimination in her Charge.[4]  *Id.*

That is not how the statutory procedure works:  "Were we to permit such vague, general allegations, quite incapable of inviting a meaningful EEOC response, to define the scope of the EEOC investigation and thereby predicate subsequent claims in the federal lawsuit, such allegations would become routine boilerplate and Title VII's investigatory and mediation goals would be defeated."  *Butts*, 990 F.2d at 1403.  The Accela Reassignment and October 2021 FPI Denial "are time-barred and thus cannot serve as predicates for allegations in the complaint said to be reasonably related," and the "Merit Promotion" Denial is "too vague" to do so either.  *Id.*

Plaintiff also argues that she is entitled to assert virtually all of her claims under the "'continuing violation' doctrine," Opp. at 26, because she "has alleged a pattern of discriminatory or harassing conduct by Defendant essentially from the time that she was hired until her constructive discharge[,]" Opp. at 27.  This is wrong for at least two reasons.

First, "[P]laintiff may not rely on a continuing violation theory of timeliness" because there is no indication that she "asserted that theory in the administrative proceedings."  *Fitzgerald v. Henderson*, 251 F.3d 345, 359–60 (2d Cir. 2001) (citing *Miller v. Int'l Tel. & Tel. Corp.*, 755 F.2d 20, 25 (2d Cir. 1985)).  In other words, "[t]his contention must be rejected because no such claim . . . was made in [Plaintiff's] EEOC complaint."  *Miller*, 755 F.2d at 25.

Moreover, Plaintiff has not adequately alleged that the "Merit Promotion" Denial—the only incident asserted in the Charge that is not clearly time-barred—had any meaningful relation to the various allegations Plaintiff now makes before this Court.  *See McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 78 (2d Cir. 2010).  Instead, she alleges only that two people mentioned nowhere

---

[4] Plaintiff's claims before the Court appear to be premised in significant part on allegations that she was discriminated against for being Black.  Nevertheless, she argues that it does not matter that she did ***not*** indicate race as a basis of discrimination in her Charge, because "the Second Circuit has discussed the uncertainty among [among] other courts as to whether 'Hispanic' is better characterized as a race or a national origin."  Opp. at 29 (alterations original, quotations omitted).

else in the Amended Complaint told her that Chalmers, the subject of the "In-A-Meeting" Incident (for which he immediately apologized), told them at some unspecified time that hiring Plaintiff for some unspecified role would "be a bad look for their unit" because she was "trouble" and "[did] not hold credentials[.]" AC ¶ 106.  This is completely untethered from allegations concerning, for example, "Riccitelli's sexual harassment of Plaintiff" or the Mask Remark by Crecenzo.  The Court, with little aid from Plaintiff's pleadings or briefing, has been able to trace a constellation between Shaw—who denied an unsolicited offer by Plaintiff to reassign herself to his District Office, AC ¶ 107–108—and the October 2021 Email, AC ¶ 41.  But, as discussed below in the context of Plaintiff's retaliation claims, any such connection is tenuous at best.

In other words, "[Plaintiff's] allegations, even if viewed in the aggregate, simply do not suggest the existence of any ongoing discriminatory policy that extends into the limitations period." *Freud v. New York City Dep't of Educ.*, 2023 WL 3103588, at *2 (2d Cir. Apr. 27, 2023) (quotation omitted) (affirming 12(b)(6) dismissal).  Instead, Plaintiffs allegations concern, at most, "discrete discriminatory acts [that] are not actionable if time barred, even [if] they [were] related to acts alleged in timely filed charges." *Morgan* 536 U.S. at 113.  That these might be considered "serial violations" changes nothing.  *Id.* at 114.

Accordingly, all of Plaintiff's Title VII claims based upon conduct other than the "Merit Promotion" Denial are DISMISSED with prejudice.

### b.  Plaintiff Fails to State a Claim Concerning the "Merit Promotion" Denial

At most, then, Plaintiff can maintain an action for discrimination or retaliation on the basis of the "Merit Promotion" Denial.  Plaintiff, however, fails to state a claim under either theory.

### (1) Discrimination

"[A]bsent direct evidence of discrimination, what must be plausibly supported by facts alleged in the complaint is that the plaintiff is a member of a protected class, was qualified, suffered

11

an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015). In other words, "a plaintiff must plausibly allege that (1) the employer took adverse action against [her], and (2) [her] race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015).

As discussed above, the "Merit Promotion" Denial—the sole basis for suit timely included in the Charge and thus preserved for review by this Court—might refer to one or more instances in which Plaintiff vaguely alleges she was not interviewed for a litany of open positions within FDNY. *See* AC ¶¶ 105–106. It might also refer in particular to Shaw's indication on June 29, 2022, that he did not require Plaintiff's "assistance in any District Office locations" in response to her apparently unsolicited offer to "remove [her]self from FDNY headquarters on temporary detail to assist . . . District Office 6/7 with all Accela Automation administrative needs." *See* AC ¶¶ 107–108. Even assuming that these amounted to more than "denial of transfer[,]" which "is not a materially adverse employment condition[,]" *Loth v. City of New York*, 2021 WL 4311569, at *8 (S.D.N.Y. Sept. 21, 2021), Plaintiff's allegations of her qualifications are at best conclusory. *See* AC ¶ 104 (referring to Plaintiff's "Master's Degree in Human Resources").

Moreover, while Plaintiff does allege that she was a member of approximately three protected classes, *see* AC ¶ 16 ("At all times material, Plaintiff was a Hispanic/Latina and African-American/Black female[.]"), in the Charge, she alleged only discrimination on the basis of national origin and sex. *See* Charge at 1 (citing "DISCRIMINATION BASED ON National Origin, Sex"). Therefore, she is entitled to bring suit only on her claims of discrimination based on national origin (Hispanic/Latina) and sex (female). Even those might not have been exhausted. *Id.* (not mentioning national origin or sex in connection with the "Merit Promotion" Denial, and

12

mentioning only sex with respect to the Accela Reassignment bonus denial).  Regardless, she has not alleged facts sufficient to lend even "minimal support,"[5] *Littlejohn*, 795 F.3d at 311, to her claim that she was discriminated against on any basis in connection with the "Merit Promotion" Denial.

Certain allegations in the Amended Complaint arguably refer, obliquely, to protected characteristics; specifically, the Mask Remark, the Black Women GIFs Incident, the Husband's Race Question, the Italian Men Question, and the Carrot-and-Stick Invitations (together, the "Protected Characteristic Incidents").[6]  However, as reflected in the Charge, none of these incidents appear to have been related in any way to the "Merit Promotion" Denial.  *See* Charge at 1 (alleging "I then asked for a merit promotion . . . but was denied," after describing not having received a bonus allegedly paid to males in connection with the much-earlier Accela Reassignment).

Instead, with respect to the "Merit Promotion" Denial—and assuming it constitutes an adverse employment action—Plaintiff alleges only that "Eric Monk and Jose Marquez" told Plaintiff "that they were told" by her "union executive leadership Daryl Chalmers . . . not to hire [her] as [she is] trouble, do[es] not hold credentials, and it would be a bad look for their unit."[7] AC ¶ 106.  Plaintiff does not specify who Monk and Marquez are or what their role was, although she does indicate that she was applying generally to "Human Resource/Human Capit[a]l roles within FDNY."  AC ¶ 105.  More importantly, Plaintiff's prior interactions with Chalmers were

---

[5] The Court is cognizant of the fact that Plaintiff at the pleadings stage is "not required to plead a *prima facie* case of discrimination." *Vega*, 801 F.3d at 84.  "[M]inimal support," however, is required, *Littlejohn*, 795 F.3d at 311, and has not been pled here.

[6] While all of these incidents are time-barred, the Court may consider them on a contextual basis in connection with Plaintiff's lone timely claim. *See Morgan*, 536 U.S. at 113.

[7] Even less context is alleged surrounding Shaw's response declining Plaintiff's apparently unsolicited offer to "remove [her]self from FDNY headquarters on temporary detail to assist . . . District Office 6/7 with all Accela Automation administrative needs."  *See* AC ¶¶ 107–108.

limited to the "In-A-Meeting" Incident and the incident underlying the Workplace Violence Investigation.  AC ¶¶ 45, 48.  As alleged, neither of these incidents—nor Chalmers' remarks to Monk and Marquez—have anything to do with Plaintiff's protected characteristics.  *Loth*, 2021 WL 4311569, at *10 (S.D.N.Y. Sept. 21, 2021) (noting that gender discrimination claims are dismissed absent allegations that "Defendant made any comments that might suggest that gender played a role in" adverse employment actions (quotation omitted)).

And against this backdrop, the Protected Characteristic Incidents appear at most as "stray remarks" that do not provide even minimal support for an inference of discriminatory motivation. *See Desrosiers v. Summit Sec. Servs., Inc.*, 2022 WL 13808524, at *3 (S.D.N.Y. Oct. 21, 2022) ("As a general matter, verbal comments may raise an inference of discrimination, but not where they lack a causal nexus to the [adverse employment] decision." (quotation omitted) (applying the test for "stray remarks" laid out in *Danzer v. Norden Sys., Inc.*, 151 F.3d 50 (2d Cir. 1998))).

First, the Protected Characteristic Incidents did not themselves involve Monk, Marquez, Chalmers, or Shaw.  *See Desrosiers* at *4 ("Remarks made by the decisionmaker who took the adverse employment action provide much better evidence of discrimination than do remarks made by those unrelated to the decisionmaking process.").  Second, the Protected Characteristic Incidents were at best temporally "oblique" in relation to any non-time-barred action that could constitute the "Merit Promotion" Denial.  *Id.*  ("[Plaintiff's] failure to specify a meaningful time frame for these remarks in relation to his firing is part of his general failure to plead context necessary" to evaluate his claims (cleaned up, quotation omitted)).  Third, "it is far from clear that a reasonable jury could find that the content of [the] remarks" constituting the Protected Characteristic Incidents "was discriminatory."  *Id.* at *4–5 (discussing "off-color" remarks concerning plaintiff's use of Haitian language and the "bad" situation in Haiti).  Finally, Plaintiff simply never closes the gap by alleging a "causal connection" between the Protected Characteristic

Incidents and the "Merit Promotion" Denial. *Id.* at \*5 ("Even assuming that [the speaker] was a decisionmaker in respect to [the adverse employment action], that the comments were made close in time to the [the adverse employment action], and that a rational jury could find the content of the remarks discriminatory—all of which are doubtful here—without some 'causal connection' to the adverse employment decision," stray remarks cannot support a discrimination claim.).

Plaintiff also gestures towards inviting the Court to conduct a comparator analysis. *See* AC ¶ 106 (noting that her "male counterpart (Kevin Despinos) [("Despinos")] with same inspector rank and no college degree was interviewed/given a chance but not hired"). Plaintiff does not provide enough information from which to infer that she "received less favorable treatment due to her gender[,]" let alone her national origin or race. *Loth*, 2021 WL 4311569, at \*10. That is, she has come nowhere near alleging that she and Despinos are "'similarly situated in all material respects[.]'" *Moultrie v. NYS Dep't of Corr. & Cmty. Supervision*, 2015 WL 2151827, at \*3 (S.D.N.Y. May 7, 2015) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000)). Moreover, Plaintiff does not allege that she received materially less favorable treatment at all— like her, Despinos was not hired, although he was given the opportunity to interview. *See* MTD at 15.

### (2) Retaliation

"[F]or a retaliation claim to survive a motion for judgment on the pleadings or a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against [her], (2) 'because' [she] has opposed any unlawful employment practice." *Vega*, 801 F.3d at 90 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e–3(a)). This means that Plaintiff must allege "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn*, 795 F.3d at 316 (quotation

omitted).  As in the discrimination context, at this stage, "the allegations in the complaint need only give plausible support to" such a showing.  *Id.* at 316.

The Court is convinced that Plaintiff has alleged an adverse employment action in the "Merit Promotion" Denial, particularly under the lower standard applicable to retaliation claims. *Vega*, 801 F.3d at 90 ("[T]he antiretaliation provision, unlike the substantive [discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment." (quotation omitted)); *but see Conway v. Healthfirst Inc.*, 2022 WL 4813498, at *4 (S.D.N.Y. Sept. 30, 2022) ("It is unclear[,]" in the context of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.*, "whether the failure to hire—or even interview—a new applicant for a position can constitute an adverse employment action for retaliation purposes."). As relevant here, Plaintiff alleges that her "complaints regarding the discrimination and harassment throughout her employment . . . led to being 'blacklisted' from promotions or other job opportunities."  Opp. at 37.  Specifically, she cites the allegation that Monk and Marquez told her that Chalmers told them "not to hire [her] . . . as she [is] trouble."[8]  *Id.*

Defendant argues that any protected activity upon which Plaintiff hopes to base her claim must itself have occurred within the limitations period discussed above.  MTD at 21 ("All of the alleged protected activities are either time-barred or Plaintiff failed to exhaust her administrative remedies in relation to them.")  As the Court reads the relevant authority, that is not how the analysis operates.  *See, e.g.*, *Vega*, 801 F.3d at 79–80 (focusing on the timeliness of the employer's alleged offenses, not the plaintiff's protected activities); *see also Morgan*, 536 U.S. at 110 (2002) ("The critical questions, then, are: What constitutes an 'unlawful employment practice' and when has that practice 'occurred'?" (quoting Title 42 U.S.C. § 2000e–5(e)(1))).  That being said, whether

---

[8] Plaintiff also appears to cite this admonition by Chalmers in connection with Shaw's denial of her offer of self-reassignment, although she does not alleged that the admonition was ever made to Shaw.  AC ¶¶ 107–108.

Plaintiff's retaliation claim was effectively raised in the Charge is a closer call. *See* Charge at 1 (linking the Accela Reassignment to the Closed-Call Incident, and Plaintiff's internal reporting thereof).

Regardless, even if timely and adequately exhausted, Plaintiff's retaliation claim fails for other reasons. To be sure, Plaintiff has alleged that she made a slew of complaints, via both formal and informal channels, at various times—indeed, seemingly almost non-stop—over the course of her employment. *See* AC ¶¶ 29–32 (following up with immediate supervisors via email, calling BITS, Boyle, DOI, and Special Investigator Martich ("Martich"), and forwarding email correspondence to Martich, all regarding the Closed-Call Incident); 41–44, 53, 58, 63, 69, 72, 84, 85 (emailing Assistant Chief Kevin Brennan, Chief Anthony Saccavino, BITS, Shaw, Benjamin, and Trevor Klass chronicling the Mask Remark, the "In-A-Meeting" Incident, and the various issues encountered during the Riccitelli Reassignment); 49 (calling Benjamin to complain of a "hostile work environment," apparently due to the Workplace Violence Investigation against her, and threatening resignation); 54 (emailing BITS and the EEO Office regarding the Workplace Violence Investigation against her, nepotism, and a hostile work environment); 82 (calling the EEO Office and BITs regarding the Would-Be Termination); 88 (forwarding prior email to Martich); 93 ("plac[ing] an anonymous call to 311/CSC regarding fire safety concerns shared by an employee"); 97 (emailing "FDNY Management," BITS, the Fire Marshalls, the "lead counsel" regarding "official misconduct . . . and the need for safety"); 99 (filing EEO Complaint and workplace violence complaint against female co-worker who threatened violence); 102–103 (emailing Federal Monitor regarding FDNY hiring practices); 105 (emailing Assisi a list of jobs for which she was not interviewed or hired).

But complaining is not itself a protected activity under Title VII. *See Mitchell v. New York City Dep't of Educ.*, 2025 WL 978366, at *3 (2d Cir. Mar. 31, 2025) (summary order) ("The

conduct of which the employee complains cannot violate just any law—rather, it must violate the specific antidiscrimination statute under which the plaintiff seeks protection from retaliation." (quotation omitted)).  Instead, a Title VII plaintiff must either participate in a formal EEOC Charge or otherwise oppose employer conduct on the basis that it violates Title VII.  *See Littlejohn*, 795 F.3d at 316 (analyzing the language of 42 U.S.C. § 2000e–3(a)).  To be clear, Plaintiff "need not show that the behavior he opposed in fact violated Title VII," just that her "protected activity was motivated by a good faith, reasonable belief that the underlying employment practice was unlawful[.]" *Mitchell v. Planned Parenthood of Greater New York, Inc.*, 745 F. Supp. 3d 68, 97 (S.D.N.Y. 2024) (quotations omitted).

The October 2021 Email seems to fit the bill—not as participation in a formal EEOC Charge, but as "informal" opposition in the form of a "complaint[] to management." *Littlejohn*, 795 F.3d at 317 (quotation omitted).  In that email, which Plaintiff also forwarded to Martich on December 29, 2021, AC ¶ 88, Plaintiff chronicled the various incidents and remarks that occurred during the Riccitelli Reassignment—many of which at least touched on the protected characteristics of sex and race.[9]  AC ¶¶ 41–44, 53, 58, 63, 69, 72, 84, 85.  Moreover, Plaintiff concluded the email by noting that "what [she has] experienced is a handful of male members who assert their dominance upon those who may appear weak and/or eager to learn and grow professionally" and that "[o]nce those assertions were questioned or identified as problematic/uncomfortable [she is] defined/labeled as the 'problem/threat/trouble maker.'"  AC ¶ 85.  To the extent these and other complaints concerning the Riccitelli Reassignment concern sex, *see, e.g.,* AC ¶ 82, they plausibly constitute protected activity in opposition to unlawful

---

[9] As discussed briefly above, however, even if Plaintiff exhausted her retaliation claim in the EEOC Charge, she cannot be said to have done so with respect to claims arising from her race, as opposed to sex or national origin.  *See* Charge at 1 (citing "DISCRIMINATION BASED ON National Origin, Sex").

discrimination.[10]

Plaintiff must also allege, at minimum, that Defendant had "general corporate knowledge that the plaintiff has engaged in a protected activity." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000).  The precise degree of knowledge that might be needed in a given case, however, will of course be calibrated in relation to the question of causation.  *Id.*  And "[u]nlike Title VII discrimination claims, . . . for an adverse retaliatory action to be 'because' a plaintiff made a charge, the plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." *Vega*, 801 F.3d at 90 (citation omitted).

Here, not only were Monk and Marquez apparently unaware of any of Plaintiff's prior complaints when they declined to promote her, AC ¶ 106, but it does not seem that Chalmers, who allegedly told them not to hire her, AC ¶ 107, was aware of those complaints, either.  Instead, Chalmers had been involved in the "In-A-Meeting" Incident, and was also present for the interaction that led to the Workplace Violence Complaint against Plaintiff.  AC ¶¶ 44–48.  Neither of these incidents is alleged to have had anything to do with Plaintiff's protected characteristics, so any complaints concerning them cannot constitute protected activity under Title VII.  *See Mitchell*, 2025 WL 978366, at *3.  Nor, more importantly, is there any allegation that Chalmers was aware that Plaintiff had raised complaints concerning these, or any other issues.  Accordingly, the only plausible reading of the facts alleged is that Monk and Marquez did not hire Plaintiff because Chalmers warned them that she was "trouble" for reasons having nothing to do with her

---

[10] These are categorically different from Plaintiff's complaints (*see* AC ¶¶ 29–32) about discrimination occurring with respect to the public, *Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125, 135 (2d Cir. 1999); complaints (*see* AC ¶¶ 54, 93, 97, 99) over issues that as pled cannot give rise to an objectively reasonable belief that Title VII has been violated, *Mitchell*, 2025 WL 978366, at *3; *see also Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011) ("The competent evidence in the record showed that any complaints Rojas made were generalized and therefore the Diocese could not reasonably have understood that she was complaining of conduct prohibited by Title VII." (quotation omitted)); and, logically, complaints (*see* AC ¶¶ 102–103, 105) that post-date adverse employment action.

opposition to discrimination—or, for that matter, simply because he noted that she did "not hold credentials."  AC ¶ 107; *see Twombly*, 550 U.S. at 545.

By contrast, Shaw—who declined to accept Plaintiff's unsolicited offer to "remove herself from FDNY headquarters . . . to assist [his] District Office 6/7 with all Accela administrative needs," AC ¶ 107–108—was included on the October 2021 Email, AC ¶ 41.  Even assuming his decision not to take Plaintiff up on her offer of internal reassignment constituted an adverse employment action, however, that decision occurred around eight months after the October 2021 Email.[11]  AC ¶¶ 41, 108.  Although the Second Circuit "has not drawn a bright line," it is hard to see how the Court could say that "the protected activity" in this case "was closely followed in time by the adverse action" so as to give rise to an inference of causation.  *Vega*, 801 F.3d at 90 (quotations omitted).  Again, because no attempt is made to link this decision to any protected activity, it is "just as much in line with" any other explanation as it is with the implausible suggestion that it might have been retaliatory.  *Twombly*, 550 U.S. at 544.

Accordingly, any remaining claim asserted by Plaintiff under Title VII is DISMISSED with prejudice.

## II.   Claims Under State and Municipal Law

Having disposed of Plaintiff's federal claims, the Court is left with a smattering of claims asserted under the laws of New York State and City.  *See* AC, Causes of Action Three–Six.  A district court[] may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction[.]"  28 U.S.C. § 1367(c)(3).  And both the Second Circuit "and the Supreme Court have held that when the federal

---

[11] The Court need not dwell on whether Plaintiff has in connection with this incident plead causation "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant," *Littlejohn*, 795 F.3d at 319, because Shaw's one-sentence response to Plaintiff's offer to reassign herself, AC ¶ 108, cannot possibly be read to that effect.

claims are dismissed the 'state claims should be dismissed as well.'" *In re Merrill Lynch Ltd. Partnerships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966), and citing *Pitchell v. Callan*, 13 F.3d 545, 549 (2d Cir.1994)). "Although this is not a mandatory rule," *Merrill Lynch*, 154 F.3d at 61, "courts weigh[ing] the factors of judicial economy, convenience, fairness, and comity" in a case where "all federal claims [have been] eliminated in the early stages of litigation" will generally "find [that] the balance of factors . . . favors declining to exercise pendent jurisdiction over remaining state law claims[,]" *Allen v. City of New York*, 2025 WL 3152723, at *2 (2d Cir. Nov. 12, 2025) (quotations omitted) (finding no abuse of discretion where district court exercised supplemental jurisdiction over NYSHRL and NYCHRL claims after having dismissed "mirror[ring] or overlap[ping]" federal claims at summary judgment).

This is such a case. *See Parks v. Montefiore Med. Ctr.*, 2024 WL 917330, at *4 (S.D.N.Y. Mar. 4, 2024) ("The only remaining claims are Parks's claims under the NYSHRL and NYCHRL. Because the Court dismisses Parks's federal claims, it declines to exercise supplemental jurisdiction over his state and city claims."); *Riley v. New York City Health & Hosps. Corp.*, 2023 WL 2118073, at *6 (S.D.N.Y. Feb. 17, 2023) ("Having dismissed all of the plaintiff's federal claims, the claims over which this Court has original jurisdiction, declining to exercise supplemental jurisdiction over the state-law and city-law claims is appropriate at this early stage of the litigation."). Unlike in *Allen*, 2025 WL 3152723, at *2, this case has been pending for only a little more than a year and discovery has not yet commenced.

Accordingly, Plaintiff's state- and municipal-law claims are DISMISSED without prejudice.

21

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's claims are DISMISSED, with prejudice as to the claims under federal law, and without prejudice as to the claims under state and municipal law. The Clerk of Court is respectfully requested to terminate docket entry number 29 and close this case.

**SO ORDERED.**

**Date:   February 17, 2026**
     **New York, NY**

_____
**MARY KAY VYSKOCIL**
**United States District Judge**